David SAENZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–92–647–CR.

Court of Appeals of Texas,
Corpus Christi.

June 9, 1994.

Rehearing Overruled July 7, 1994.

James R. Lawrence, Corpus Christi, for appellant.

Carlos Valdez, Dist. Atty., James D. Rosenkild, Asst. Dist. Atty., Nueces County Courthouse, Corpus Christi, for appellee.

Before KENNEDY, GILBERTO HINOJOSA and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

FEDERICO G. HINOJOSA, Jr., Justice.

A jury found appellant guilty of murder, assessed punishment at life imprisonment, and affirmatively found that appellant used a deadly weapon during the commission of the offense. By five points of error, appellant complains that the trial court erred by failing to grant his requested charge on voluntary manslaughter, by overruling his objection to the court's charge, by sending all the exhibits to the jury when not requested to do so, and by excluding evidence on state of mind and intent. We affirm the judgment of the trial court.

Appellant and his wife, Ernestina, married in 1949. Throughout their forty-two year marriage, appellant worked and Ernestina stayed at home, kept the house and raised their eleven children. Appellant was a very jealous man. Appellant suspected that some of his son's friends were interested in his wife in a sexual way and that when she went for periodic gynecological examinations, she was having an affair with her doctor. Appellant was also very authoritarian with his family. Over the years, appellant locked his wife in the house, struck her, threatened her with a knife and a gun, and even shot the tires of his son's car when he broke curfew. After appellant had retired, the children had all left home, and his mother had died, appellant became increasingly depressed and he and Ernestina began having marital problems. Appellant accused her of being jealous of his mother.

During the summer of 1991, appellant learned that the mortgage company had foreclosed on the house next door and that it was accepting bids on the property. Appellant submitted a bid of $16,000.00. Juan Sanchez, a neighbor who lived down the block, called appellant and asked him how much he had bid. Appellant told him and then added, "If it's worth more than that to you, fine." Appellant subsequently learned from the mortgage company that Sanchez had bid $18,000.00 for the property. Appellant initially decided to let Sanchez have the property, but after Ernestina offered to give him the $2,000.00 needed to match Sanchez's bid, he increased the bid to $18,000.00. The mortgage company accepted appellant's increased offer and gave him a special warranty deed. Appellant refused to accept the special warranty deed, demanding a general warranty deed. When the mortgage company refused to issue a general warranty deed, appellant

backed out of the deal, and Sanchez wound up with the property.

Sanchez then began fixing up the property, and appellant perceived some sexual "anxiety" in Ernestina toward Sanchez, "like she wanted to go over and help him." Appellant became upset with Ernestina and started to resent Sanchez. When Ernestina suggested that appellant repaint the street number on the curb, appellant painted over it "to let her know there was nothing wrong" with the numbers and "I was unhappy with what she had told me, that I was aware of her anxiety."

After Sanchez painted the house, he put up a "for sale by owner" sign. Appellant saw Sanchez and asked him how much he wanted for the house. According to appellant,

I think that is what we were talking about, and then my wife came out with a glass of water. And it wasn't the water that bothered me, but she came and said, "Oh, Mr. Sanchez, I thought you would like to have a glass of nice ice cold water." She never spoke to me that way, and I didn't answer, because I was surprised, stunned. I was shocked. I was left speechless. They saw the impression in my face. She turns around to go back in. Mr. Sanchez drank half a glass, took the other half, and gave me the glass, and I brought it in. I said, "Why didn't you wait for the glass?"

Ernestina recalled that appellant became very mad, so she went back inside. He then accused her of having a relationship with Sanchez and wanted to know why she had not brought out two glasses of water. According to appellant, "If it was hot out there for him, it must have been just as hot for me." Appellant continued to confront Ernestina about the incident. Appellant testified that either that night or the following night,

She was in the back bedroom, and I was in the front one. I went and got a glass of water, a nice ice cold water, and I threw it at her.

\* \* \* \* \* \*

That is the kind of man I am. I says, "I am doing that to cool you down because you went over there like a bitch in heat. If I would have treated the worst prosti-

tute in the world the way I have treated you, buying you gold watches and diamond rings, I said, she would have treated me with more respect and love than what you showed me there."

Ernestina then had a son drive her to another son's house, where she spent the night.

Ernestina returned home the next day. Sometime later, appellant suggested that she walk around the block for exercise. Appellant crossed the street and watched her. As she passed Sanchez's house the second time around, appellant thought she walked a little slower, "with her head down and looking towards the inside of the school, to the school ground." Appellant believed this was a signal to Sanchez to let him know where she was going. When Sanchez came out in shorts to walk his dogs, appellant got mad. He drove around the block, found Ernestina talking with some women, and made her get in the car and go home with him. When Sanchez returned home, appellant told Ernestina, "that was a very short walk he gave his dogs."

During the next twelve months, appellant continued to hound Ernestina about this matter. He accused her of dreaming about Sanchez. He suspected her motives when she, accompanied by her daughter, went to Sanchez's garage sale, even though Mrs. Sanchez had invited her. He tore up their wedding pictures, cut up their wedding rings and threw them out in the lawn where the water incident had taken place, destroyed her sewing machine, and smashed a $1,000 watch which he had given her. He abused her by hitting her, crushing her hands, tearing off her clothes, and threatening her with knives and guns.

Appellant told Ernestina that if he ever caught her and Sanchez together, he would kill him. Once, when Sanchez was outside, appellant sang a song through an open window which said in part, "I am manly enough to do away with whoever is making love to you" to let Sanchez "hear it as a warning."

On June 16, 1992, appellant pushed Ernestina in the house and again asked, "Why did you have to give him the glass of water?" Ernestina responded that she was tired of all

the harassment and that if he did not stop, she was going to leave. Appellant pushed her again, she pushed him back, and he pushed her on the bed, got on top of her and hit her, bloodying her lip and blackening her eye. He continued to question her about the "anxiety" and water incident. Ernestina pushed him off of her and ran outside. Appellant followed her down the street, continuing to hit her. Ernestina made it to a neighbor's house and called one of her sons. Fearing for her life, Ernestina separated from appellant that day and went to stay in San Antonio with one of her sons who was a police officer.

Appellant was upset that Ernestina had left him. He claimed that she must have had a relationship with Sanchez, even though his children assured him that she had not. He also claimed that Sanchez wanted to break up the marriage so that he could get his gun and coin collections and buy his house for less than it was worth.

On July 3, 1992, appellant was lying down at home when one of his sons brought appellant's sister to visit him. Appellant saw Sanchez next door doing yard work. Appellant believed Sanchez did so because he thought Ernestina had returned. Appellant sent his son to go get some duplicate keys made. Appellant and his sister stayed in the front air-conditioned bedroom watching television.

Appellant testified:

I was laying down, and I started trembling. I started trembling, and all of a sudden, it got to my mind, I said, "You have hurt me enough. You have come between me and my wife, and you are not going to hurt me anymore. You are not going to hurt anybody else anymore." And that is the only thought that I had. I jumped out of bed trembling, and I went and got my shotgun. My sister was still in the bedroom, and I went and shot him.

Appellant testified that he walked outside, pointed the gun at Sanchez, who was squatting down unarmed about twenty feet away, and said, "You like investments, I have one for you," and shot him in the hip, knocking him down. Sanchez did not have a chance to run and did not say anything. While Sanchez was down in a sitting position, appellant shot him again in the side with a deer slug. When Sanchez was down in a stretched out position, appellant shot him a third time in the temple with a deer slug, causing what the medical examiner described as "horrible damage." Between thirty seconds and two minutes elapsed between shots.

Appellant testified, "I shot him because ... for a year or better, I have been the victim of his triangle. I didn't want him hurting me anymore." Appellant admitted that he only "suspected" Sanchez and Ernestina were having an affair. Appellant stated that he had every intention of killing Sanchez when he shot him and that was why he shot him three times.

Appellant then walked back inside his house, called the police and reported the incident. When the police arrived, appellant walked outside to meet them and handed over the shotgun, which he had placed inside a case. Spent shell casings found in the yard and a deer slug removed from Sanchez's body during the autopsy were found to have been fired from the shotgun appellant gave the police.

Appellant was charged with the offense of murder.[1] The indictment states, in relevant part, as follows:

> that DAVID SAENZ, defendant, on or about July 3, 1992, in Nueces County, Texas, did then and there intentionally and knowingly cause the death of an individual, Juan Sanchez, by shooting him with a firearm;
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> that DAVID SAENZ, defendant, on or about July 3, 1992, in Nueces County, Texas, did then and there with the intent to cause serious bodily injury to an individual, Juan Sanchez, do the act of shooting him with a firearm; that this act was clearly dangerous to human life; and that this act caused the death of Juan Sanchez.

At trial, appellant pleaded not guilty to murder. Appellant requested that the lesser included offense of voluntary manslaughter be

---

1. TEX.PENAL CODE ANN. § 19.02(a)(1) (Vernon　1989).

included in the charge. The State objected and argued that the evidence did not sufficiently raise the issue of sudden passion to allow the voluntary manslaughter charge to go to the jury for determination. The trial court agreed with the State, denied appellant's request, and charged the jury on the offense of murder only. The jury found appellant guilty of murder.

■ By his first point of error, appellant complains that the trial court erred by failing to grant his request that the lesser included offense of voluntary manslaughter be included in the charge. Appellant contends that his testimony is sufficient to raise the issue of sudden passion arising from an adequate cause at the time of the shooting.

■ A charge on voluntary manslaughter is appropriate when there is evidence that the defendant caused the death of another under the "immediate influence of sudden passion arising from an adequate cause." TEX.PENAL CODE ANN. § 19.04(a) (Vernon 1989).[2] The testimony of the accused alone can raise the issue of voluntary manslaughter. *Gonzales v. State*, 838 S.W.2d 848, 855 (Tex.App.—Houston [1st Dist.] 1992), *pet. dism'd, improvidently granted*, 864 S.W.2d 522 (Tex.Crim.App.1993); *Brunson v. State*, 764 S.W.2d 888, 893 (Tex.App.—Austin 1989, pet. ref'd).

■ The "sudden passion" must be "directly caused by and arising out of provocation" by the deceased or another acting with the deceased "at the time of the offense." TEX.PENAL CODE ANN. § 19.04(b). *See Hobson v. State*, 644 S.W.2d 473, 478 n. 10 (Tex. Crim.App.1983) ("Sudden passion" described as excited and agitated state of mind at time of killing caused by direct provocation by victim). Passion solely the result of former provocation is insufficient. *Marras v. State*, 741 S.W.2d 395, 405 (Tex.Crim.App.1987); *Nance v. State*, 807 S.W.2d 855, 860 (Tex. App.—Corpus Christi 1991, pet. ref'd). "Adequate cause" is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary

temper, sufficient to render the mind incapable of cool reflection." TEX.PENAL CODE ANN. § 19.04(c). Not all testimony of anger or fear entitles a defendant to a voluntary manslaughter charge. *Nance*, 807 S.W.2d at 860.

We have thoroughly reviewed the evidence. We find no evidence that appellant's emotions constituted "sudden passion" or that his emotions resulted from provocation by the deceased or another acting with the deceased at the time of the offense that would constitute "adequate cause." *See Nance*, 807 S.W.2d at 860. In addition, we find no evidence of immediate provocation by the victim. Instead, the evidence reflects that appellant acted in a calm and deliberate manner when he shot Sanchez three times with a shotgun, without any provocation from the victim at the time of the killing. A charge on voluntary manslaughter was not appropriate.

We hold that the trial court did not err by failing to grant appellant's request that the lesser included offense of voluntary manslaughter be included in the charge. Appellant does not challenge the sufficiency of the evidence to support his murder conviction. Nevertheless, after reviewing all of the evidence, we conclude that a rational jury could find from the evidence that appellant is guilty of the offense of murder. Appellant's first point of error is overruled.

By his second point of error, appellant complains that the trial court erred by overruling his objection to the jury charge because the charge did not contain details of the conditions of probation.

■ Error in the charge, subject to a timely objection, requires reversal if the error is "calculated to injure the [defendant's] rights," meaning there need only be a showing of "some" harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985). *See* TEX.CODE CRIM.PROC.ANN. art. 36.19 (Vernon 1989). In defining "some" harm, the Court of Criminal Appeals has stated:

> that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

2. TEX.PENAL CODE ANN. § 19.04(a) defines voluntary manslaughter as follows:

A person commits an offense if he causes the death of an individual under circumstances

the presence of *any* harm, regardless of degree, which results from preserved charging error, is sufficient to require a reversal of the conviction. Cases involving preserved charging error will be affirmed only if *no* harm has occurred.

*Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim.App.1986).

Appellant contends that, in light of *Brass v. State*, 643 S.W.2d 443 (Tex.App.—Houston [14th Dist.] 1982, pet. ref'd), an accused is entitled to have all the allowable statutory terms and conditions of probation enumerated in the court's charge to the jury upon proper request and objection. Appellant argues that the trial court committed reversible error by not including the requested terms of probation in the punishment charge and that the sentence to life imprisonment is evidence of harm.

■ A trial court need not inform the jury of any conditions of probation. *Yarbrough v. State*, 742 S.W.2d 62 (Tex.App.—Dallas 1987), *pet. dism'd, improvidently granted*, 779 S.W.2d 844, 845 (Tex.Crim.App.1989) (overruling *Brass v. State*). We hold that the trial court did not err by failing to include the terms and conditions enumerated in TEX.CODE CRIM.PROC.ANN. art. 42.12, § 11(a) (Vernon Supp.1994) in the punishment charge. Appellant's second point of error is overruled.

■ By his third point of error, appellant complains that the trial court erred by sending the trial exhibits to the jury when the jury did not request them.

After the jury withdrew for deliberation on guilt-innocence, the trial court stated that it was going to send to the jury Sanchez's clothing which had been placed on a mannequin and shown to the jury during trial. Appellant objected to the mannequin being sent to the jury because it had not been marked as an exhibit and had not been admitted into evidence. The trial court overruled appellant's objection. Appellant then objected to any exhibits being sent to the jury because the jury had not requested them. This objection was also overruled.

■ Article 36.25 of the Code of Criminal Procedure states as follows:

There shall be furnished to the jury upon its request any exhibits admitted as evidence in the case.

TEX.CODE CRIM.PROC.ANN. art. 36.25 (Vernon 1981). It is error to refuse or fail to allow the jury to have the exhibits admitted into evidence upon request. *Lopez v. State*, 628 S.W.2d 82, 85 (Tex.Crim.App. [Panel Op.] 1982). Although it is not in strict compliance with art. 36.25 for the trial court to submit evidence to the jury without request, to do so does not amount to reversible error. *See Johnson v. State*, 846 S.W.2d 373, 377 (Tex. App.—Houston [14th Dist.] 1992), *rev'd and remanded on other grounds*, 853 S.W.2d 574 (Tex.Crim.App.1993), *on remand*, 857 S.W.2d 812 (Tex.App.—Houston [14th Dist.] 1993, pet. granted); *Robinson v. State*, 704 S.W.2d 565, 568 (Tex.App.—Beaumont 1986, pet. ref'd). The record reflects that appellant did not object to the introduction of the clothing or the use of the mannequin at trial. We hold that there was no harm and no reversible error for the trial court to submit these exhibits to the jury without request. Appellant's third point of error is overruled.

■ By his fourth point of error, appellant contends that the trial court erred by excluding evidence on appellant's state of mind at the time of the alleged offense. Appellant's witness, Dr. Carlos Estrada, a psychiatrist, testified that appellant suffered from a "delusional disorder." At the end of two extensive rounds of direct and cross-examination of Dr. Estrada, the trial court informed counsel, "this is the last round." On the third round, appellant's counsel asked the witness whether, at the time of the offense, appellant was sane. Dr. Estrada opined that "He was not." On further re-cross, the State asked the following:

Doctor, a person who is diagnosed as Delusional Disorder does not automatically be considered insane. Is that true?"

Dr. Estrada responded, "Not automatically." The trial court then prevented appellant's counsel from starting a fourth round, even though appellant's counsel stated that he only wanted to ask one more question.

Appellant's counsel was subsequently allowed to make a bill of exceptions. During a

short recess, and outside the presence of the jury, the following occurred:

Trial Court: Let's hear the question you had, Mr. Tinker.

Appellant's Counsel: Yes, Your Honor. My recollection of the last question asked of Dr. Estrada by counsel was, the fact that someone had a Delusional Disorder did not necessarily mean that they were insane.

Trial Court: Automatically insane?

Appellant's Counsel: Automatically insane. My·intention was to ask him whether or not a person with a Delusional Disorder, whether or not that did mean that they had a serious mental disease or defect. And that would be the response to the question she had just asked. So I make a proffer of that, and I would like to ask him.

Trial Court: All right. The request is denied.

Appellant contends that, because his entire defense was based on the issue of insanity, the question should have been allowed. The State contends that, pursuant to TEX.R.CRIM. EVID. 610(a), the trial court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to, among other things, avoid needless consumption of time.

■ Clearly, the court retains wide latitude to impose reasonable limits on examination of witnesses. *Virts v. State,* 739 S.W.2d 25, 28 (Tex.Crim.App.1987). *See Gutierrez v. State,* 764 S.W.2d 796 (Tex.Crim.App.1989); *Castle v. State,* 748 S.W.2d ·230 (Tex.Crim. App.1988); *Satterwhite v. State,* 499 S.W.2d 314 (Tex.Crim.App.1973). Nevertheless, the Court of Criminal Appeals has recently held that:

An informal bill will suffice as an offer of proof when it includes a concise statement of counsel's belief of what the testimony would show. *Moosavi v. State,* 711 S.W.2d 53 (Tex.Crim.App.1986). When counsel intends to rely upon an informal bill to pre-

serve error, the bill must include a summary of the proposed testimony.

*Love v. State,* 861 S.W.2d 899, 901 (Tex.Crim. App.1993). *See Easterling v. State,* 710 S.W.2d 569, 578 (Tex.Crim.App.1986), *cert. denied,* 479 U.S. 848, 107 S.Ct. 170, 93 L.Ed.2d 108 (1986); *Bryson v. State,* 820 S.W.2d 197, 198–199 (Tex.App.—Corpus Christi 1991, no pet.); *Johnson v. State,* 800 S.W.2d 563, 566 (Tex.App.—Houston [14th Dist.] 1990, pet. ref'd).

■ We find that counsel's statement is insufficient to preserve error for review. TEX.R.APP.P. 52(b). Appellant's counsel failed to provide the trial court with a summary of the proposed testimony or a concise statement of what the testimony would show. Even if the complaint had been properly preserved, we conclude that any error was harmless. On the issue of insanity as a defense, the witness had already testified that, in his opinion, 1) appellant suffered from a severe mental disorder, 2) that appellant was not sane at the time of the offense, and 3) that appellant did not believe that he was doing something wrong.[3] Appellant's fourth point of error is overruled.

■ By his fifth point of error, appellant complains that the trial court erred by refusing to allow certain testimony from his expert witness, Dr. John Sparks, during the punishment phase of the trial. The testimony concerned whether or not appellant, at the time of the shooting, was able to conform his conduct to the requirements of the law.

At the beginning of the punishment phase of the trial, the State requested that all the evidence previously admitted during the guilt-innocence phase of the trial be readmitted into evidence for the jury's consideration on punishment. Appellant objected. The trial court admitted all of the evidence, except certain evidence concerning appellant's alleged sexual contact with his daughter, which the trial court found to constitute an inadmissible extraneous offense. The trial court instructed the jury accordingly.

3. TEX.PENAL CODE ANN. § 8.01(a) (Vernon Supp. 1994) provides as follows:
It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

Appellant proceeded to offer the testimony of appellant's probation officer, two medical experts, two family members, and a character witness. During direct examination by appellant's counsel, Dr. John C. Sparks opined that appellant had a serious disease of the mind and that, at the time of the offense, he knew what he did was wrong. Appellant's counsel then asked Dr. Sparks if he had an opinion whether or not appellant could conform his conduct to the law at the time he shot the victim. The State objected, adding,

> That is not the law. And it is outside of the—it is just not the law.

The court then asked appellant's counsel to rephrase the question, and the State reurged its objection on the same grounds. The court sustained the State's objection and stated that the issue had already been decided. Appellant's counsel acknowledged to the court that the issue of insanity had already been decided by the jury, but added,

> this, hopefully, will help them know what was going on as far as Mr. Saenz is concerned at the time so they can decide, so they will know that it was an impulse, that he couldn't control. They have a right to know that.

The trial court again sustained the State's objection and stated that the issue had been decided.

Appellant's counsel was allowed to make the following bill of exceptions outside the presence of the jury:

> Appellant's Counsel: Doctor, do you remember when you were testifying, I asked you that whether or not you had an opinion that on July the 3rd, 1992, which is the date of the offense, at the time of the shooting of Mr. Sanchez based on the Delusional Disorder that you found, Mr. Saenz could conform his conduct to the requirement of the law at that time?
>
> Dr. Sparks: I don't believe he could, no sir.
>
> Appellant's Counsel: And as far as you are concerned, what he did was something

because of his mental disease and defect he could not help doing? He couldn't stop himself at that time?

> Dr. Sparks: Although he knew it was wrongk [sic], and I believe he could not stop himself, no, sir.
>
> Appellant's Counsel: Your Honor, the reason I want to get that question and get those answers is, is the jury has a right to know whether he is a vicious human being in committing that act, you know—cool, deliberate killer, as compared to someone who is just really seriously sick. And I think those answers would assist the jury in deciding what the punishment should be in this case.
>
> Trial Court: The request is denied; that the evidence is admitted as a Bill.

The record reflects that appellant elicited relevant and admissible testimony concerning insanity during the guilt-innocence phase of the trial. All of the testimony from the guilt-innocence phase of the trial had been read-mitted into evidence and was before the jury for its consideration. By the time appellant offered this evidence, the issue of his criminal culpability had already been determined by the jury.

■ Evidence that appellant, at the time of the offense, could not conform his conduct to the requirements of the law is no longer a necessary element of insanity as an affirmative defense to prosecution.[4] The trial court committed no error in refusing to admit the doctor's testimony because the jury had already determined that appellant was sane. In addition, any evidence regarding "irresistible impulse" attempts to allude to a doctrine that is no longer recognized in Texas. *Freeman v. State*, 166 Tex.Crim. 626, 317 S.W.2d 726, 730 (1958); *Simpson v. State*, 163 Tex. Crim. 385, 291 S.W.2d 341 (1956). Therefore, the trial court did not commit any reversible error when it determined that this testimony was irrelevant during the punish-

---

4. Section 8.01 of the Penal Code was amended by Acts 1983, 68th Leg., p. 2640, ch. 454 § 1, eff. Aug. 29, 1983. When it amended the statute, the Legislature deleted "either" and "or was incapa-

ble of conforming his conduct to the requirements of the law he allegedly violated" from subsection (a) of § 8.01.

ment phase of the trial.[5] Appellant's fifth point of error is overruled.

The judgment of the trial court is AFFIRMED.

---

5.  TEX.CODE CRIM.PROC.ANN. art. 37.07, § 3(a) (Vernon Supp.1994) provides, in pertinent part, as follows:

    Regardless of the plea and whether the punishment is assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Criminal Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.